**McGRAIL & ROWLEY, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**No. 95–10017–CIV.**

United States District Court,
S.D. Florida.

Dec. 9, 1997.

David P. Horan, Key West, FL, for Plaintiffs.

Lisa B. Hogan, Asst. U.S. Atty., Office of U.S. Atty., Miami, FL, Lyn Jacobs, U.S. Dept. of Justice, Environment and Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, for Defendants.

## ORDER

ROETTGER, District Judge.

This action was brought by McGrail and Rowley, Inc. (MRI), a corporation in the business of operating catamarans out of Key West, Florida, and Herbert Pontin, an individual, against the Secretary of the United States Department of the Interior and several other officials of the United States Fish and Wildlife Service (FWS). MRI brought this action to challenge the Fish and Wildlife Service's denial of MRI's application for a special use permit to transport passengers to Boca Grande Key, an island within the Key West National Wildlife Refuge. (KWNWR) Pontin brought this action to challenge the FWS's decision to issue him a Notice of Violation for trespass within Refuge waters.

The KWNWR was established in 1908 by President Theodore Roosevelt's Executive Order 923 to provide "a preserve and breeding ground for native birds.". The administration of the Refuge is governed by the Refuge Administration Act of 1966, ("Refuge Act"), 16 U.S.C. § 668dd et seq., and administered by the Secretary of the Interior through the Fish and Wildlife Service. Federally owned islands within the Refuge were designated as part of the National Wilderness Preservation System (NWPS) pursuant to the Wildlife Act of 1964. Pub. Law 88–577. Congress intended the NWPS to be "administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness...." 16 U.S.C. § 1131(a). "Wilderness" is defined to be "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c).

Boca Grande Key is a small island located within the Key West NWR. The island features a narrow beach on the west and southwest sides. The only part of the beach providing access at any tide is a 700–foot section on the northeast side. The island provides a habitat for a variety of wildlife, including federally-listed threatened and endangered species: piping plover, peregrine falcon, and bald eagle. Green, loggerhead and hawksbill turtles, which are all endangered or threatened, nest or have nested on the beach and dune areas of Boca Grande. State-listed endangered sea lavender grows adjacent to the beach on the southwest side.

In 1992 the FWS and the State of Florida, Department of Natural Resources adopted a Management Plan entitled, "Management Agreement for Submerged Lands Within Boundaries of the Key West and Great Heron National Wildlife Refuges." The purpose of the Plan was to identify the resource problems in protecting certain islands and their associated wildlife.

The Plan cited damage to the wilderness values in certain areas of the Refuge and adopted certain actions to curtail the damage, including a recognition that greater enforcement of existing regulations was necessary, and that law enforcement efforts should be bolstered. With respect to commercial use of refuge islands, the Plan provided as follows: "The regulations governing commercial use of refuge islands will be followed. Commercial use of refuge islands requires a permit. Permit requests will be evaluated on a case-by-case basis for compatibility with the purposes for which the refuges were established."

It is official FWS policy to permit private parties to visit Boca Grande Key; only a portion of the 700 foot beach is restricted to visitors.[1] Boca Grande Key is identified in the Management Plan as having a "chronic history of public use problems (large scale littering, vegetation clearing, and cooking fires) and ... crowds in excess of 40 persons." Said crowding was feared to cause a "greater chance of degradation of natural

---

**1.** On the day the Court viewed Boca Grande Key with counsel, the parties, and FWS Biologist Wilmers, there were three private boats anchored there. Picnicking frequently occurs and fairly close to the most current turtle nesting site.

resources and noncompliance with established regulations."

The Plan was formally approved by the Florida Board of Trustees in November, 1992, upon entry into "Management Agreement for Certain Lands in Monroe County, Florida" with the United States Fish and Wildlife Service. The Agreement authorizes the FWS to manage the Refuges pursuant to the Management Plan, and "in accordance with the policies of the Fish and Wildlife Service, as well as the regulations set forth in the [Refuge Act]."

For more than a year prior to the commencement of this action, MRI had been taking passengers to the public beach on Boca Grande Key in a Sebago catamaran. MRI had not been issued a permit for this activity. The Refuge Manager for the Key West NWR, defendant Jon Andrew, met with the president of MRI, Paul McGrail, in January, 1994, regarding commercial use of the refuge islands. After the meeting, Andrew sent McGrail a letter dated March 4, 1994, describing the permitting process and a document entitled "Information and Guidelines for Permit Applicants."

On June 23, 1994, MRI submitted its permit application, entitled "Proposal for Limited Commercial Access of Boca Grande in the Key West National Wildlife Refuge." The application sought a permit to bring tours of "less [sic] than 50" people to Boca Grande Key four days a week, for about an hour. The 65–foot catamaran would be anchored in the deep water channel on the northwest end. Passengers would wade ashore, advised to stay below the high tide mark. Some would travel by kayak around the north side of the island. Other passengers would be provided kites, paddleballs and frisbees for play in the water.

In a letter dated August 3, 1994, from Refuge Manager Jon Andrew, the FWS denied MRI's permit application, finding, *inter alia*, that the proposed activities were "incompatible with the purposes of the refuge." Andrew requested that MRI cease its commercial activities at Boca Grande Key, and notified MRI of its right to an appeal. Andrew telephoned Paul McGrail on August 10 to discuss the permit denial and appeal process. MRI continued to bring passengers to Boca Grande after the permit denial.

On October 13, 1994, MRI submitted its appeal. The Assistant Regional Director for Refuges and Wildlife, defendant Geoffrey Haskett, wrote MRI's then-counsel a letter dated November 9, 1994, acknowledging receipt of MRI's appeal and informing counsel that "an appeal is meaningless" as long as MRI continued to use the refuge for commercial purposes without a permit. The FWS did not process MRI's appeal.

Plaintiff filed this action on March 10, 1995, asking the court to order defendants to provide MRI an appeal pursuant to the applicable regulations (Count I), and seeking a declaratory judgment regarding a variety of issues surrounding the permitting process and the authority of the FWS to regulate the commercial use of Boca Grande Key (Count II).

Plaintiffs filed an emergency motion seeking a temporary restraining order (TRO), and the court held a brief hearing. The parties agreed to the entry of two TROs. The March 21, 1995, TROs prohibited the government from seizing any of plaintiffs' vessels or arresting the vessels' captains for activity related to transporting passengers to and from public beaches at Boca Grande and Woman Key, and prohibited plaintiffs from violating any federal law applicable to the Key West National Wildlife Refuge.

After the entry of the dual TROs, the FWS sent a letter to MRI indicating that in light of the court's order forbidding MRI from violating federal laws on the refuge, the service would process MRI's appeal. MRI was invited to contact Haskett to arrange an oral presentation and to submit written material in support of its appeal, but it failed to do so. Without further participation from MRI, the FWS Regional Director upheld the Refuge Manager's denial of a permit by letter dated May 22, 1995. This constituted the final decision of the agency pursuant to 50 C.F.R. § 25.45(d).

Plaintiff Herbert Pontin is a maritime captain apparently not associated with MRI. Pontin was issued a Notice of Violation (NOV) by the FWS for trespass for his oper-

ation of a personal watercraft on the Great White Heron National Wildlife Refuge northeast of Key West. Pontin brings his action against FWS to challenge the issuance of the NOV and the related procedures.

The parties herein agreed that the subsequent disposition of MRI's appeal rendered moot Count I of the complaint, which sought an order requiring FWS to process MRI's appeal. This left pending Count II of the complaint, brought in part pursuant to the judicial review provisions of the Federal Administrative Procedure Act. 5 U.S.C. § 701 *et seq.* The court will address the claims of the respective plaintiffs in turn.

## MRI AND THE ADMINISTRATIVE PROCEDURE ACT

The APA provides those aggrieved by final agency action with an opportunity for judicial review. Section 706 of the APA limits judicial review of informal agency action to the confines of the administrative record created by the agency. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). The role of the court in reviewing agency action is limited by Congress——it is well established that a reviewing court cannot substitute its judgment for that of an agency.

Only in limited circumstances may a court go beyond the agency record. One such circumstance is when there are allegations of "bad faith" on the part of the agency. *Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla. 1994). This court found in open court that the withholding of MRI's appeal until after the instant action had been filed was evidence of bad faith by the agency and its lawyers. The court found it strange that the FWS failed to process MRI's appeal until this litigation was underway——and that it smacked of an attempt to gain a tactical advantage in the instant proceeding. Moreover, FWS had repeatedly represented to MRI that it would hold public hearings regarding the use of the Refuge Islands. The hearings were never held, making FWS's actions appear more suspect. The court took testimony from plaintiff and defendants regarding the permitting decision in an effort to "resolv[e] the alleged procedural irregular-

ities and misconduct" on the part of the FWS. *Id.*

While the apparent procedural irregularities surrounding plaintiff's appeal are indeed troubling, after considering all of the testimony the court finds that it has not been established that the agency actors responsible for denying MRI's permit application had "unalterably closed mind[s]" with respect to the decision to deny the permit. *Id.* at 1574. As the court has found insufficient evidence of bad faith in the actual decisionmaking process, the court's attention turns to the proper scope of judicial review.

The court's role is limited by statute. Agencies have the benefit of superior expertise and an ability to relate the facts surrounding a given action to the overall agency mission. Congress has directed courts to accord deference to agency decisionmaking with the judicial review provisions of the APA. Informal agency adjudication, which is at issue in this case, must be set aside if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D).

The Supreme Court instructs that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973). The reviewing court must apply the standard of review as set forth in the APA to the agency decision based on the administrative record. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). If an agency's decision "was based on a consideration of relevant factors," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

The court's inquiry is two-fold. It must be determined whether the agency reasonably interpreted its enabling act and corresponding regulations, and it must be determined whether the agency rationally applied its interpretation to the facts of this case.

## THE GOVERNING LAW BEHIND THE PERMITTING DECISION

The Fish and Wildlife Service operates under the Refuge Act, 16 U.S.C. § 668dd. The Act authorizes the Secretary to "permit the use of any area within the System … whenever he determines that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(A). A FWS regulation, specifically 50 C.F.R. § 27.97, provides that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special use permit." The regulations do not define "commercial enterprise," but the agency's own interpretation of the term can be found in the FWS Refuge Manual. The Manual, which is published neither in the Federal Register nor the Code of Federal Regulations, sets forth FWS policy and guidelines for the operation of federal wildlife refuges. The Manual provides that "[i]f a profit is realized" from certain activities, including tours and guide services, then the activities are considered to be commercial. The activity conducted by MRI, transporting members of the public to the refuge island for a fee, falls within the agency's definition of a commercial activity. It is plain that the FWS has the authority to require a special use permit for MRI's activity pursuant to 50 C.F.R. § 27.97.

## CONSIDERATION OF RELEVANT FACTORS: "ARBITRARY AND CAPRICIOUS" REVIEW

A review of the administrative record reveals that the agency's decision to deny MRI's permit application was made after considering the relevant factors, and that it did not make a clear error in judgment. Section 668dd(d)(1)(A) of the Refuge Act requires the agency to determine whether a permit is compatible with the major purposes for which the area is established. Neither the Refuge Act nor FWS regulations define "compatible," but the refuge manual contains the Service's interpretation. The manual states: "A use may be determined to be compatible if it will not materially interfere with or detract from the purpose(s) for which the refuge was established." The document entitled "Information and Guidelines for Permit Applicants" sent by refuge manager Jon Andrew to MRI president Paul McGrail states that applications are "strictly reviewed for the impacts of the activity on wildlife and their habitat."

The agency actor relied on various laws, regulations and internal guidelines in determining compatibility, including President Theodore Roosevelt's 1908 Executive Order establishing the refuge. The Order set aside the islands "as a preserve and breeding ground for native birds." The Wilderness Act, as discussed previously, requires agencies to "manage designated [w]ilderness so as to insure that wilderness character is preserved and protected."

The refuge manager also relied on Wildlife Biologist Tom Wilmers' assessment of MRI's proposal. Wilmers' memorandum, dated July 7, 1994, conveyed his "very serious concerns" about MRI's operations in this "very sensitive … area." Wilmers addressed the potential damage to Boca Grande Key, which he describes as "one of the premier islands for wildlife in the entire lower Florida Keys." Of particular concern to the biologist were preservation of nesting areas for green turtles (all nests had been found in dunes located very near the area to be used by MRI's customers), damage to the shoreline from excessive public use (nearly 10,000 passengers annually), and the regular use of kites, paddleballs and frisbees, which he suggested is incompatible with the wilderness character of the island.

Wilmers is a dedicated biologist whose testimony about Boca Grande Key——clearly "the apple of his eye" among the islands in the Refuge——was at times a bit emotional. He gives lip service to the Agency position that the public is welcome to come by private boat to the Refuge islands, but the court feels he does not believe it. He clearly dislikes the visitors who picnic, wade in the

water by the beach, and especially the kayakers.

In his August 3, 1994, letter to Paul McGrail officially denying the permit application, refuge manager Andrew makes explicit his reasoning. Andrew found, *inter alia*, that MRI's proposed activities would adversely affect wilderness values and were incompatible with refuge purposes. He also states that refuge resources were inadequate to administer and manage the proposed use, and that he was "reluctant to issue several permits until a reliable evaluation of costs can be made." Further, "[t]he small size of the beach and the concentration of current public use activities" caused the refuge manager concern about conflicts among groups using the island. Finally, the refuge manager points out that MRI engaged in its commercial activities without a permit despite actual notice from the agency that a permit was required. The agency perceived this as a demonstration of "bad faith" on the part of MRI, and "raise[d] questions about [MRI's] future performance under a special use permit."

Plaintiff argues that FWS's decision to permit another commercial use of Woman Key,[2] a nearby refuge island, that of Adventure Catamaran Tours, Inc. ("Stars & Stripes"), while denying MRI's application is evidence that the agency's decision was arbitrary and capricious. A review of the administrative record establishes that the decisions were rationally based. The refuge manager specifically found that the Stars & Stripes tour was, unlike that of MRI, "passive and education oriented." Further, Stars & Stripes passengers had not been observed entering closed areas, as had MRI's passengers. The record supports the agency's decision based on relevant factors, and therefore this court may not set it aside as arbitrary and capricious, although the court is dubious about FWS's appraisal of Stars & Stripes and this court might well have come to different conclusions, if writing on a clean slate.

## ENFORCEMENT OF SPECIFIC REFUGE MANUAL PROVISION

Plaintiff's argument that the agency exceeded its authority by requiring a permit for MRI's activity cannot be sustained. The argument is based on a certain portion of the Refuge Manual addressing public access to coastal island refuges. 8 RM1–002. Under the subtitle "Specific Guidance," it is stated: "An individual who repeatedly provides access to an island for a refuge [sic] for a fee and uses government facilities to dock or unload passengers, should be under [sic] special use permit." Plaintiff argues that because MRI does not use government facilities to dock or unload passengers, a permit is not required. This reading is too restrictive when considered along with the Refuge Act and regulations. The Refuge Act, 16 U.S.C. § 668dd authorizes the Secretary to "permit the use of any area within the System ... whenever he determines that such uses are compatible" with refuge purposes. The regulations provide that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special use permit." 50 C.F.R. § 27.97. The language in the Refuge Manual regarding island access does not purport to repeal the agency's power under the binding statutes and regulations to deny permits for commercial uses determined to be incompatible with refuge purposes.

Further, plaintiff has not shown that the Manual or any of its particular provisions carry the independent force and effect of law such that this court can force the agency to comply with its provisions. "Obviously, not every piece of paper released by an agency can be considered a regulation entitled to the force and effect of law." *Hamlet v. United States*, 63 F.3d 1097, 1103 (Fed.Cir.1995) (holding that personnel manual not enforceable "regulation"). In *Lumber, Production and Industrial Workers Log Scalers Local 2058 v. United States*, 580 F.Supp. 279 (D.Or. 1984), a district court addressed whether provisions in the United States Forest Service Manual had the force of law. The question was whether the Manual provision at issue was "an internal management guideline or a rule affecting important substantive rights promulgated under a statutory grant of authority." *Id.* at 282. The court found

2. Woman Key is the principal winter home of the endangered piping plover.

that the provision was neither a substantive rule nor promulgated in conformance with the notice and comment rulemaking procedures specified in the APA, and therefore was not binding. *See also Western Radio Services Co., Inc. v. Espy,* 79 F.3d 896 (9th Cir.1996) (reviewing Forest Service permitting decision only under binding regulations but not Forest Service Manual as Manual does not have force and effect of law).

Neither the Refuge Act nor the regulations relating to refuge operations refer to the Manual. The language of the Refuge Manual is generally advisory and policy-oriented.[3] The agency does not appear to have conformed with APA procedural requirements for rulemaking in producing the manual. The court is aware of no caselaw addressing whether the FWS Refuge Manual is binding. One commentator has suggested that it is not, noting that the non-binding nature of the Refuge Manual leaves refuge managers with much leeway in making compatibility determinations: "The Refuge Manual ... calls upon refuge managers to perform periodic reviews of ongoing secondary uses to ensure continued adherence to the compatibility standard. But, unfortunately, this guiding principle lacks the force of law and leaves refuge managers considerable discretion in implementing guidelines and authorizing secondary uses." Priestly, *Comment: The National Wildlife Refuge System: Incompatible Recreational and Economic Uses of Refuge Lands,* 1992 Pac. Rim L. & Pol'y J. 77, 82 (1992). Based on the foregoing, the court concludes that the Manual states FWS policy and provides guidance to refuge managers, but is not binding on FWS.

**FEDERAL AUTHORITY OVER STATE-OWNED LANDS**

■ Plaintiff also relies on Fla. Stat. § 253.03(7)(a) to challenge defendants' authority to require a permit to carry passengers to Boca Grande. The statute permits Florida's Board of Trustees of the Internal Improvement Trust Fund to adopt rules and regulations regarding the use of sovereignty submerged lands by vessels. The statute provides that "[t]he regulations must not interfere with commerce or the transitory operation of vessels through navigable water, but shall control the use of sovereignty submerged lands as a place of business or residence." Fla. Stat. § 253.03(7)(b). Plaintiff argues that this statute divests the Board of all authority to "interfere with commerce or the transitory operation of vessels through navigable water," and therefore the Board had no authority to restrict MRI's operations, and therefore could not delegate any authority to do so to the FWS via the Management Agreement.

Even if plaintiff is correct that this section divests the Board of all authority to regulate commerce and the operation of vessels through state-owned waters,[4] it does not follow that the FWS lacks authority over commercial use of refuge islands. The Property Clause of the United States Constitution provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...." Relying on this clause, courts have held that the federal government has authority to regulate conduct on non-federal land "when reasonably necessary to protect adjacent federal property or navigable waters." *United States v. Lindsey,* 595 F.2d 5, 6 (9th Cir.1979) (holding that United States had control over conduct of defendants who, lacking permits, built a campfire on state land adjacent to national forests). *See also State of Minnesota by Alexander v. Block,* 660 F.2d 1240 (8th Cir.1981) ("Congress clearly has the power to dedicate federal land for particular purposes. As a necessary incident of that power, Congress must have the ability to insure that these lands be protected against interference with their intended purposes."). This court finds that the FWS was acting within its authority pursuant to the Property Clause in regulating MRI's operations through state-owned waters to federal-

---

**3.** For example, 8 RM 1.1 opens with the following statement: "The purpose of this chapter is to provide a central reference source of overall policy relating to public use management within the [Refuge System]...."

**4.** The court expresses no opinion on this issue.

ly-owned Boca Grande Key.[5] The agency plainly has the power to regulate conduct "on or off the public land that would threaten the designated purpose of federal lands." *Id.* at 1249.

## PROCEDURAL VIOLATIONS

 Plaintiff has raised claims of procedural violations by defendants in the processing of its permit application. First, MRI claims that defendants did not provide plaintiff an opportunity to respond to the permit denial pursuant to 50 C.F.R. § 25.45(b). This section requires the refuge manager to notify the applicant orally or in writing prior to making an adverse decision on the application. The applicant then has twenty days to present a statement in opposition to the proposed action. The administrative record indicates that refuge manager Jon Andrew contacted Paul McGrail by telephone on July 5, 1994 to discuss the refuge manager's perceived problems with the permit application. MRI did not respond with a statement. The court will not exalt form over substance by holding that the July 5, 1994 telephone call did not comply with the notice requirement. Plaintiff was provided actual notice of the refuge manager's concerns well before the official denial of the permit and presumably had an opportunity at that time to address said concerns.

 Plaintiff also complains of FWS's failure to allow MRI's appeal of the permit denial to go forward until after the commencement of this litigation. Defendants rely on 50 C.F.R. § 25.45(g) for withholding adjudication of the appeal, citing MRI's refusal to comply with the refuge manager's decision by continuing its operations to Boca Grande Key. Subsection (g) provides in pertinent part as follows: "Compliance with any decision or order of a refuge manager shall not be suspended by reason of an appeal having been taken unless such suspension is authorized in writing by the area manager or regional director...." This subsection does not provide explicit authority for withholding plaintiff's right to an appeal, notwithstanding plaintiff's noncompliance. MRI has since been granted an appeal. It is noteworthy that plaintiff at no time suspended its commercial operations to Boca Grande Key. Plaintiff has not established that it was injured by the delay, and the court cannot disturb the agency decision based on this procedural irregularity.[6]

## MRI & PONTIN'S CLAIMS REGARDING ISSUANCE OF N.O.V.s

 Plaintiff MRI, along with Herbert Pontin, seek declaratory and injunctive relief preventing defendants from continuing their allegedly illegal "practice of issuing a 'Notice of Violation for a Petty Offense' (that does not exist) and demanding that unless One Hundred (in the individual Pontin's situation) or Two Hundred Dollars (for corporations, such as Plaintiff MRI) is paid, then there will

---

**5.** There is sufficient evidence in the record before the court to corroborate the agency's determination that regulation of the waters surrounding the refuge islands is necessary to preserve their wilderness character. *See, e.g.,* Administrative Record, Document 6, Tom Wilmers' Report re: Public Use and Preservation of Wilderness in the Key West National Wildlife Refuge; Administrative Record, Document 8, Tom Wilmers' Report re: Observations of commercial use of Boca Grande Key; Administrative Record, Document 25, Management Agreement (noting the adverse effects of boating, waterskiing, and personal watercraft use on refuge wildlife).

**6.** The government's conduct has often been vexatious: From one hearing to the next, government attorneys would recede from the position their predecessors had taken in a prior hearing.

This court expected a compromise settlement to be worked out with some curtailing of the number of passengers and some limits on the activities of MRI's passengers, and at one time a settlement seemed imminent. However, FWS' attorney learned to her surprise at a lunchtime call to Washington that a mysterious consent decree in a case from the Western District of Washington prevented a settlement. The case apparently was filed by certain preservationist groups such as Friends of Animals, Humane Society, Defenders of Wildlife, et al., against FWS. Notably, none of the sportsmen or consumer organizations such as Izaak Walton League, Safari Club International, Foundation for North American Wild Sheep, etc., were parties or apparently even aware of it. Curiously, the decision was not available on Westlaw or Lexis. All this raised the suspicion that the decree was a "sweetheart deal" resulting in FWS agreeing to survey every Wildlife refuge and re-evaluate the permitted uses within a year even though this created a decided and freely revealed personnel strain on FWS.

be an Information or Grand Jury Indictment with up to one (1) year in jail and up to One Hundred Thousand (for Pontin) or Two Hundred Thousand Dollars (for MRI) in civil fines." Complaint at ¶ 64(1).

This claim arises from defendants' attempts to cite plaintiffs for alleged violations of the Refuge Act, 16 U.S.C. § 668dd, and regulations issued thereunder.

Herbert Pontin is a licensed captain living in the Florida Keys who became concerned about the FWS's attempts to regulate the waters surrounding the Refuge. Pontin attended meetings regarding the Management Agreement between the Board of Trustees of the Internal Improvement Trust Fund and the FWS, hoping "to protect our right to navigate." Transcript, September 22, 1995, at 377. Pontin apparently felt that the FWS's regulation of these areas was unlawful and wished to challenge the agency's authority.

In July, 1993, Pontin, on a jetski, entered navigable waters within the Great White Heron Refuge. FWS officials approached him and advised him that he was trespassing, "took down all [his] information" and said a ticket would be forthcoming. Id. at 379. After a period of delay and considerable effort on his own part, Captain Pontin received a Fish & Wildlife Violation Notice citing him with trespass in violation of 16 U.S.C. § 668dd and 50 C.F.R. § 26.21 (General trespass provision) for entering a closed refuge area. Plaintiff's Exhibit 32.

The Violation Notice informed Pontin that he could dispose of the case by paying a collateral amount ($100.00) in lieu of appearance, or he could appear in court to contest the charges. Pontin wished to contest the charge, and through counsel filed a Motion to Dismiss the Violation Notice in the United States District Court. Plaintiffs' Exhibit 33.

The United States soon after moved to dismiss the Violation Notice. Plaintiffs' Exhibit 35. In its motion, the government noted that a violation of the Refuge Act is a Class A misdemeanor punishable by a maximum of one year imprisonment or a maximum fine of $100,000 for an individual. As a result, pursuant to Fed. R. Crim P. 58(b)(1),

the case could proceed to trial only by way of indictment or information. The government sought a dismissal of the Violation Notice "without prejudice so as to afford the United States the opportunity to proceed in accordance with the requirements of Rule 58." Upon dismissal of the Violation Notice, the government proceeded no further against Captain Pontin for his alleged trespass.

MRI also received a notice of violation of a Class A misdemeanor for its catamaran carrying passengers to Boca Grande Key. The notice advised MRI it could dispose of the matter by paying $200. Upon learning that the maximum fine was $200,000 with a claim by the government that each trip was a separate violation, together with a threat of seizure of their catamaran, MRI quickly paid the $200 forfeiture of collateral and filed this suit.

The penalties provision of the Refuge Act, 16 U.S.C. § 668dd(e) provides: "Any person who violates or fails to comply with any of the provisions of this Act or any regulations issued thereunder shall be fined under Title 18, or imprisoned for not more than 1 year, or both." This offense is classified as a Class A misdemeanor. 18 U.S.C. § 3559(a)(6).

A "petty offense" is defined in 18 U.S.C. § 19 as "a Class B misdemeanor, or an infraction" for which the maximum fine is no greater than $100,000.00 in the case of an individual, and no greater than $200,000.00 in the case of an organization. See 18 U.S.C. § 3571. Class B misdemeanors carry penalties of six months imprisonment or less. 18 U.S.C. § 3559(a)(7). Under this scheme, a violation of the Refuge Act is clearly not a petty offense.

Subsection (d)(1) of Federal Rule of Criminal Procedure 58, which generally deals with procedures for "Misdemeanors and Other Petty Offenses," provides:

When authorized by local rules of the district court, payment of a fixed sum may be accepted in suitable cases in lieu of appearance and as authorizing the termination of the proceedings. Local rules may make provision for increases in fixed sums not to exceed the maximum fine which could be imposed.

This Rule does not restrict the forfeiture of collateral option to petty offenses, and instead leaves the determination of which misdemeanors, if statutorily appropriate, may be disposed of by this payment procedure to the district court, through its local rules.

At all times relevant to the events herein, General Rule 88.4 of the Local Rules for the United States District Court for the Southern District of Florida read in part:

> Petty offenses, as defined in 18 U.S.C. Section 1,[7] which are committed within the boundaries of National Parks, Preserves, Historic Sites, or Government Reservations, ... for which collateral may be posted and forfeited in lieu of appearance by the person charged, together with amounts of collateral to be posted and offenses for which a mandatory appearance is required, shall be in accordance with schedules which may from time to time be approved by the Court and filed with the Clerk.

This Local Rule appears to contemplate that the forfeiture of collateral option be available in the Southern District of Florida to persons and organizations charged with *petty* offenses, in accordance with schedules filed with the Clerk.

United States District Court for the Southern District of Florida by Administrative Order 89–39, (Defendants' Exhibit 7), entered by then-Chief Judge King for the Court, adopted a collateral forfeiture schedule for regulations enforced by the United States Fish and Wildlife Service. The schedule provides collateral amounts payable for violations of regulations promulgated under the Refuge Act, 16 U.S.C. § 668dd, including 50 C.F.R. § 26.21(a), trespass by a person on a National Wildlife Refuge.

It is evident that the administrative order purports to provide the forfeiture of collateral option to those charged with violations of the Refuge Act, but is in conflict with the Local Rule which contemplates the procedure to be reserved for petty offenses.[8] The court finds that Administrative Order 89–39 is void and unenforceable to the extent it conflicts with Local Rule 88.4 by authorizing the forfeiture of collateral option for nonpetty offenses. The government is hereby enjoined from providing the forfeiture of collateral option to persons charged with violations of the Refuge Act in the Southern District of Florida unless and until the Local Rules provide that the procedure is available to those charged with non-petty offenses.

## QUALIFIED IMMUNITY

█ The government argues that the individual defendants are immune from an award of money damages pursuant to the doctrine of qualified immunity. It is established that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The court, noting that plaintiffs' complaint seeks primarily injunctive relief and a declaratory judgment, finds that to the extent plaintiffs have prevailed on their claims involving the forfeiture of collateral procedure, money damages are not appropriate. However, in the interest of completeness the court finds that the individual defendants are immune from damages for their actions.

It is not entirely clear to what extent, if any, the individual defendants were involved

---

7. The court notes that title 18 U.S.C., section 1 was repealed by Pub.L. 98–473, and is applicable to offenses committed prior to Nov. 1, 1987. Section 1 classified a petty offense as a misdemeanor for which the penalty does not exceed six months imprisonment. A violation of the Refuge Act would not be considered a petty offense under this section.

8. The court cannot help but note the irony inherent in plaintiff Pontin's challenge to the government's "practice" of offering the forfeiture of collateral option to violators of the Refuge Act.

The government provided Pontin with an alternative available by Local Rule only to those charged with less serious offenses. Had the government not acted in accordance with the challenged administrative order, Pontin indisputably could have been charged from the outset by indictment or information, facing a relatively serious penalty pursuant to the Refuge Act. The record does not indicate that Pontin was injured by the government's actions, and further the record does not indicate that the government acted in bad faith in pursuing this course.

in the events surrounding the issuance of notices of violations to plaintiffs. Even assuming the named defendants participated in the events, it is plain that the law regarding the forfeiture of collateral procedure was far from "clearly established." Defendants were operating under a flawed statutory scheme featuring a conflict between an Administrative Order and a Local Rule. Under the circumstances, it would be manifestly unjust to hold them personally liable for the violation of plaintiffs' rights.

## ATTORNEY'S FEES

■ Plaintiffs filed a motion early in this litigation seeking an interim award of attorney's fees. Plaintiffs, pointing to the fact that defendants awarded MRI their administrative appeal only after the commencement of this litigation, claimed to have prevailed on Count I of the Complaint. Count I, as discussed above, was a mandamus count in which MRI sought to compel defendants to grant its appeal. Expressing no opinion on its merits, the court denied plaintiffs' motion for interim fees, specifying that the denial was without prejudice.

The court is now in a position to revisit the issue, which has already been briefed by counsel. The relevant statute is the Equal Access to Justice Act, (EAJA), specifically 28 U.S.C. § 2412(d)(1)(A). The statute provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

It must be decided whether: a) plaintiff MRI is a "prevailing party"; b) the defendants' position was "substantially justified" and c) whether there are circumstances making an award against the government unjust.

■ Contrary to defendants' position as set forth in their memorandum opposing an award of fees, a plaintiff may be considered a prevailing party without a formal adjudication on the merits. "[A] party may be considered to be 'prevailing' if the litigation successfully terminates by a consent decree, an out-of-court settlement, a voluntary cessation of the unlawful practice by the defendant, or other mooting of the case where the plaintiff has vindicated his right." *Doe v. Busbee*, 684 F.2d 1375, 1379 (11th Cir.1982). *See also Iranian Students Ass'n v. Sawyer*, 639 F.2d 1160, 1163 (5th Cir.1981). The fact that Count I was rendered moot by defendants' actions in granting MRI's appeal before this court had an opportunity to rule does not preclude a determination that MRI is a prevailing party as to Count I.

As the Eleventh Circuit stated in *Martin v. Heckler*, 773 F.2d 1145, 1149 (11th Cir. 1985) (en banc), the question is "whether plaintiffs' lawsuit was a catalyst motivating defendants to provide the primary relief sought in a manner desired by litigation." (citing *Robinson v. Kimbrough*, 652 F.2d 458, 465 (5th Cir.1981)) (quotations omitted). The plaintiffs in Martin were a class of applicants and recipients of the Aid to Families With Dependent Children program whose benefits had been denied or terminated on the ground that paternity had not been established in a state court action. Plaintiffs filed suit to challenge the relevant policy, and moved for a preliminary injunction. The district court deferred ruling on the motion based on the government's representations that the policy would be rescinded and the affected applicants would be reinstated. The case was subsequently dismissed as moot, and plaintiffs moved for attorneys fees under the EAJA. The Eleventh Circuit reversed the district court's determination that under these circumstances plaintiffs were not prevailing parties:

> The threshold question that must be addressed is whether plaintiffs are prevailing parties where, as here, the statutory claims are mooted by defendants' remedial action subsequent to the lawsuit. There is nothing in the record to show that either the state or federal defendants had done anything toward reinstating benefits or

giving them retroactive effect until the suit was filed.... We have searched the record in vain to find anything that would show that the plaintiffs' action was not necessary to bring about a change in the policy.

In these circumstances we have no doubt that plaintiffs are prevailing parties.

*Id.* at 1148–49.

In the instant case, as in *Martin,* the desired relief— the processing of MRI's administrative appeal—did not occur until defendants were faced with this litigation. Defendants gave no indication that the long-overdue administrative appeal would be granted prior to the filing of this case. The court finds that MRI is a prevailing party with respect to Count I.

The next question is whether the government's position was "substantially justified." Courts interpreting the language have held that the test for substantial justification is one of reasonableness. *United States v. 4880 S.E. Dixie Highway,* 838 F.2d 1558, 1561 (11th Cir.1988). The Supreme Court has stated that a finding of substantial justification requires more than a mere finding that the government's position is undeserving of sanctions for frivolousness. *Commissioner, Immigration and Naturalization Service v. Jean,* 496 U.S. 154, 159 n. 7, 110 S.Ct. 2316, 2319 n. 7, 110 L.Ed.2d 134 (1990); *Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988).

The government has argued before this court that the decision of the FWS to withhold adjudication of MRI's appeal was based on 50 C.F.R. § 25.45(g). As discussed above, this regulation provides that persons may not suspend compliance with an order or decision of a refuge manager pending an appeal without FWS permission.[9] It appears to the court that MRI violated this provision by continuing its commercial tour operations to Boca Grande after the denial of its permit application. However, it is equally plain that this regulation provides no support for the government's position in this litigation that the FWS acted properly in refusing to process MRI's appeal. Nothing in the regulation authorizes the Service to suspend its own appellate procedures based on a determination that the would-be appellee has not complied with a refuge manager's decision.[10]

The government claims that the decision to take no action on MRI's appeal was also made "for policy reasons to curb future abuses of the National Wildlife Refuge regulations to protect the wildlife and wilderness character of the refuge." Federal Defendants' Opposition to Plaintiffs' Motion for Interim Award of Attorneys Fees, at 8. This is tantamount to suggesting that the FWS would be justified in ignoring their own duly enacted procedures as set forth in the Code of Federal Regulations anytime agency officials determine that doing so might benefit the refuge. This argument is untenable, and the court finds that the defendants are not "substantially justified" within the meaning of 28 U.S.C. § 2412(d)(1)(A).

An award of fees under the EAJA is nonetheless inappropriate if "special circumstances" would make an award unjust. 28 U.S.C. § 2412(d)(1)(B). The government argues that MRI's "continuing illegal activities" (i.e., taking passengers to Boca Grande for profit) constitute "special circumstances" in this case. The court does not look with favor upon the conduct of plaintiff MRI in continuing its operations to Boca Grande after the refuge manager's permit denial. Neither party is without blame in this case. However, under all of the circumstances, the court finds that the government has not met its burden of showing that an award of fees

---

**9.** Subsection (g) provides in pertinent part as follows: "Compliance with any decision or order of a refuge manager shall not be suspended by reason of an appeal having been taken unless such suspension is authorized in writing by the area manager or regional director...."

**10.** FWS has not suggested that it had no recourse against MRI for its continued violation of the manager's decision other than suspending the appeals process. It appears to the court that at the time FWS decided not to process plaintiff's appeal the agency had the option of enforcing the refuge manager's decision by citing MRI for trespass pursuant to 50 C.F.R. § 26.21(a), which provides: "No person shall trespass, including but not limited to entering, occupying, using, or being upon, any national wildlife refuge, except as authorized in this subchapter C or in other applicable Federal regulations."

would be unjust. Courts rarely invoke the "special circumstances" exception to deny fees under the EAJA, *see Taylor Group, Inc. v. Johnson,* 919 F.Supp. 1545, 1549 (M.D.Ala. 1996), and there are no compelling reasons to do so here. The FWS, faced with an apparent continuing violation of the Refuge Act, chose to ignore its own regulations and bring the administrative process to a halt. The administrative appeal was granted only as a result of this litigation, and plaintiff is now entitled to a reasonable attorney's fee.

Plaintiff is **ORDERED** pursuant to 28 U.S.C. § 2412(d)(1)(B) to provide the court within 30 days of the date of this Order an itemized statement of fees and costs relating only to Count I. The court will not entertain a request for fees incurred by plaintiff *after* the government granted the administrative appeal sought by plaintiff MRI in Count I.

The Clerk of Court is instructed to close this case. All remaining motions are denied as moot.