# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2023

Lyle W. Cayce
Clerk

No. 21-60897

Harrison County, Mississippi; Hancock County, Mississippi; City of Biloxi, Mississippi; City of D'Iberville, Mississippi; City of Waveland, Mississippi; Mississippi Hotel and Lodging Association; Mississippi Commercial Fisheries United, Incorporated; City of Pass Christian, Mississippi; City of Diamondhead, Mississippi,

*Plaintiffs—Appellants*,

*versus*

United States Army Corps of Engineers,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:19-CV-986

Before Richman, *Chief Judge*, and Ho and Engelhardt, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Plaintiffs aggrieved by increased usage of the Bonnet Carré Spillway sued the Army Corps of Engineers to compel the Corps' preparation of a supplemental Environmental Impact Statement as purportedly required by

No. 21-60897

the National Environmental Policy Act (NEPA). The district court granted the Corps summary judgment on the plaintiffs' NEPA claims after finding that the plaintiffs could not avail themselves of the federal government's waiver of sovereign immunity in cases in which a federal agency fails to comply with a discrete duty to act. We agree and AFFIRM.

I

A

Relentless rains in 1927 fueled an overflowing Mississippi River that brought ruin to a stretch of the Mississippi River Valley the size of Massachusetts, Connecticut, New Hampshire, and Vermont.[1] Drowning hundreds and displacing hundreds of thousands, the Great Flood of 1927 drove Congress' passage of the Flood Control Act of 1928. *See* Pub L. No. 70-391, ch. 569, 45 Stat. 534 (codified at 33 U.S.C. § 702a). That legislation provided for the establishment of the Mississippi River and Tributaries Project (the "MR&T"), a comprehensive flood control program tasked with averting the worst Mississippi River flood conceivable—the so-called "project design flood."

The Bonnet Carré Spillway (the "Spillway") is a central component of the MR&T. Thirty-three miles upriver from the heart of New Orleans, the Spillway employs an impressive system of mechanisms to—when necessary—divert river water otherwise destined for New Orleans into Lake

---

[1] *See, e.g.*, Stephen Ambrose, *Man vs. Nature: The Great Mississippi Flood of 1927*, Nat'l Geographic (Apr. 30, 2001) ("Rain in biblical proportions fell from the sky through the winter. Then, in the spring, the waters began to rise. . . . The levees failed. Here, there, sometimes it seemed everywhere, the river undercut the levees. Water poured through breaks called crevasses, covering with 30 feet of water land where nearly one million people lived. Twenty-seven thousand square miles were inundated. . . . By July 1, even as the flood began to recede, 1.5 million acres were under water. The river was 70 miles wide. Still the rains came. The river rose higher.").

Pontchartrain, and in turn, the Mississippi Sound. The Spillway's benefit to New Orleans is twofold: for one, the Spillway shields the City from river flow that would otherwise be overwhelming; for another, it saves the City the trouble and expense of heightening its levees to manage such flow on its own.

Unfortunately, the Spillway's aid to New Orleans comes at a cost to the environment and to the Mississippi-based plaintiffs in this case. Through its injection of freshwater into Lake Pontchartrain and the Mississippi Sound, the Spillway's deployment takes a toll on a host of environmental and economic interests, causing everything from disruptions to oysters, sea turtles, and shrimp, to toxic algae blooms, seafood warnings, and beach closures.

Exacerbating these externalities is a marked—and unexpected—increase in the frequency with which the Spillway must be used, which itself has been accelerated by changing river conditions[2] that make reliance on the Spillway an increasingly common fact of life. Designed to activate (or "open") when river flow at New Orleans would otherwise exceed 1.25 million cubic feet per second (cfs)—the rate the City's levees can safely handle on their own—and originally projected to operate "infrequently and for comparatively short periods of time," the Spillway has become considerably more vital in recent years. Indeed, as the district court noted in a detailed review of the Spillway's history, "on average, the Spillway has been opened every 6 years over an 89-year period[, but] 6 of the 15 openings during that 89-year period occurred in the past 10 years, and 4 of the openings occurred between 2018 and 2020." Some expect that matters will only get worse. An LSU analysis, for example, projects a notable increase in river

---

[2] As the Corps concedes, "[d]ue to scouring of the channel," the Spillway's triggering flow level once corresponded to a 20-foot reading at the Carrollton gauge near New Orleans, but now corresponds to a mere 17-foot reading at the same gauge.

No. 21-60897

flow "as a result of riverbed aggradation" and "sand bar growth," and, perhaps more predictably, rising global temperatures and intensified hydrologic cycles.

B

The plaintiffs in this case are a group of Mississippi municipalities and associations harmed and threatened by this turn of events. In the only claim pertinent to this appeal,[3] they sued the Army Corps of Engineers (the "Corps") under Administrative Procedure Act (APA) § 706(1) for the Corps' refusal to prepare a supplemental Environmental Impact Statement (EIS)[4] as assertedly required by NEPA and accompanying regulations. In essence, the plaintiffs contend that the increased frequency and duration of Spillway openings in recent years has damaged the Mississippi coast and the economic interests relying on it in a way the Corps has not sufficiently considered in an EIS. They specifically seek—as immediately relevant here—a declaration that the Corps has violated NEPA by failing to supplement its 1976 EIS for the MR&T to address changing circumstances regarding the Spillway, and an order requiring the Corps to undertake such environmental analysis "with all due haste."

---

[3] A second claim by the plaintiffs alleging violations of a separate federal statute concerning fishery conservation and management was recently decided by the district court and has been separately appealed, and the district court's dismissal of a second defendant (the Mississippi River Commission) was not appealed. As such, the plaintiffs' APA claim against the Corps is all that remains for our present review.

[4] In contrast to a comparatively modest Categorical Exclusion (CATEX) or Environmental Assessment (EA), an Environmental Impact Statement (EIS) is the most "detailed and rigorous" environmental analysis a federal agency can be required to take when it "develops a proposal to take a major federal action." EPA, NATIONAL ENVIRONMENTAL POLICY ACT REVIEW PROCESS, https://www.epa.gov/nepa/national-environmental-policy-act-review-process.

No. 21-60897

Invoking the federal government's sovereign immunity, the Corps moved to dismiss for lack of subject matter jurisdiction. The parties agreed on the legal question at issue—namely, whether NEPA and related regulations impose on the Corps a discrete duty to act that a federal court can compel it to honor under APA § 706(1)—but disagreed on the answer to the question. After extensive jurisdictional discovery, the district court construed the Corps' motion as a motion for summary judgment[5] and dismissed the plaintiffs' NEPA claims. This appeal followed.

II

At bottom, this case presents just one legal question—namely, do NEPA and its regulatory progeny obligate the Corps to prepare a supplemental EIS as the plaintiffs seek to compel under APA § 706(1)? That question, in turn, hinges on a single factual question—namely, does "major Federal action" remain outstanding to necessitate the Corps' preparation of a supplemental EIS under applicable laws and regulations? As we explain below, the answer to both questions is no, and that itself is dispositive, for without the jurisdictional hook supplied by the APA's narrow waiver of sovereign immunity, there is no basis for jurisdiction in this suit against a nonconsenting federal agency.

---

[5] Because the Corps' entitlement to sovereign immunity (and, consequently, the presence or lack of federal jurisdiction over the NEPA aspects of this case) is inextricably intertwined with the merits of the plaintiffs' NEPA claims, the district court was correct to construe and resolve the Corps' motion to dismiss on sovereign immunity grounds as an attack on the merits. *See M.D.C.G. v. United States*, 956 F.3d 762, 768–69 (5th Cir. 2020) ("[W]hen the issue of jurisdiction is intertwined with the merits, district courts should 'deal with the objection as a direct attack on the merits of the plaintiff's case under either Rule 12(b)(6) or Rule 56.'" (quoting *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004))).

A

Questions of subject matter jurisdiction are reviewed de novo. *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 170 (5th Cir. 2009). By the same token, "[w]hether the United States is entitled to sovereign immunity is a question of law which this court reviews de novo." *Koehler v. United States*, 153 F.3d 263, 265 (5th Cir. 1998). Likewise, "[w]e review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007) (citing *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000)).

B

"It is well settled that the United States may not be sued except to the extent that it has consented to suit by statute." *Id.* "Consequently, no suit may be maintained against the United States unless the suit is brought in exact compliance with the terms of a statute under which the sovereign has consented to be sued." *Id.* As such, "[w]here the United States has not consented to suit or the plaintiff has not met the terms of the statute, the court lacks jurisdiction and the action must be dismissed." *Id.* at 266.

Because the Corps does not consent to the plaintiffs' suit here, this case may only proceed in federal court if the plaintiffs can show that a statutory waiver supplies a basis for overcoming the Corps' sovereign immunity. To that end, the plaintiffs point exclusively to § 702 of the APA, which waives federal sovereign immunity in federal actions "seeking relief other than money damages and stating a claim that an agency . . . acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. Caselaw has confined this right of review to cases in which a plaintiff can "identify some 'agency action' affecting him in a specific way" and "show that he has 'suffered legal wrong because of the challenged agency

action, or is adversely affected or aggrieved by that action within the meaning of a relevant statute.'" *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990)). "Agency action" can encompass agency *inaction* as well,[6] and the statute provides redress to plaintiffs aggrieved by an agency's failure to act by requiring courts to "compel agency action unlawfully withheld" in § 706(1). Important here, the Supreme Court has held that a claim under § 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.* (SUWA), 542 U.S. 55, 64 (2004).

In search of a discrete obligation to act with which the Corps has unlawfully failed to comply here, the plaintiffs look to NEPA, and specifically to that statute's requirement that agencies supplement EISs when certain criteria are met. Ultimately though, their attempt in this regard is one of square pegs and round holes. A short analysis shows why.

## C

To determine whether the Corps has failed to meet its legal obligations, we naturally must delineate what those obligations are. In this respect, the statute, regulations stemming from it, and binding caselaw tell us all we need to know.

NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *SUWA*, 542 U.S. at 72. "Often an initial EIS is sufficient, but in certain circumstances an EIS must be supplemented." *SUWA*, 542 U.S. at 72. NEPA regulations specify those

---

[6] *See* 5 U.S.C. § 551(13) (defining "agency action" as, *inter alia*, "failure to act").

circumstances. As the relevant rule, § 1502.9(d)(1), now provides,[7] agencies shall prepare supplemental EISs when "a major Federal action remains to occur, and: (i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1). The Supreme Court has accordingly held that supplementation is "necessary only if 'there remains "major Federal actio[n]" to occur,' as that term is used in § 4332(2)(C)." *SUWA*, 542 U.S. at 73 (alteration in original) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)).

Thus arises the crux of the matter here—does "major Federal action" remain outstanding in this case that would necessitate the Corps' preparation of a supplemental EIS? On this decisive question, the parties engage in a classic battle of framing. The plaintiffs zoom *out* to focus on the MR&T as a whole, observing that at least $8.4 billion of "authorized work" remains on the broader project of which the Spillway plays just a part. The Corps, by contrast, zooms *in* to focus on the Spillway in particular, noting that the Spillway "has been fully constructed for 90 years, and [that] the Corps continues to apply the same operational criteria set out in the [S]pillway's foundational design documents."

Whatever the merits of their dueling perspectives in the abstract, both the plaintiffs' and the Corps' principal cases—*Marsh* and *SUWA*, respectively—favor the Corps. Start with *Marsh*. There, the Supreme Court

---

[7] It bears noting that the form of the rule has been amended in the years since the Supreme Court's decisions in *SUWA* and *Marsh v. Oregon Natural Resources Council* "to improve readability" and enhance "clarity." *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,328–29 (July 16, 2020). The pertinent language remains unchanged as a substantive matter, however, so we apply the Supreme Court's precedents in this area with full force.

No. 21-60897

observed that the language in what is now § 1502.9(d)(1) obligates agencies to supplement an EIS in situations where supplementation serves NEPA's requirement "that agencies take a 'hard look' at the environmental effects of their *planned action*." *Marsh*, 490 U.S. at 373–74 (emphasis added). Making clear that an agency's inquiry is forward-looking in nature and pertaining to the environmental impact of projects *to come* or *under consideration*, the Court articulated a rule of reason that "turns on the value of the new information to the *still pending* decisionmaking process." *Id.* at 374 (emphasis added). Thus, the Court concluded,

> In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* (alterations in original) (quoting 42 U.S.C. § 4332(2)(C)).

Applying that language here places the fatal flaw with the plaintiffs' argument in stark relief—while the plaintiffs identify an abundance of new *information* regarding the Spillway's usage and impacts, they identify no pending *decisionmaking* regarding the Spillway that might hinge on the Corps' consideration of that new information. As an attempted end-around, the plaintiffs press that ongoing construction elsewhere in the MR&T and deficient levees downstream of the Spillway convert the Spillway into the kind of "proposed action" that requires supplemental environmental assessment. But this is a stretch. As the Corps correctly counters, "[r]egardless of whether some structures within the [MR&T] are currently under construction, any new information yielded by further analysis of the [S]pillway's impacts could have no effect on the construction or design of the Spillway itself," which indeed is both a completed project and what this case

9

is really about (which is to say, the aspect of the MR&T that is the most direct and proximate cause of the plaintiffs' environmental injuries). Moreover, as the district court observed, the plaintiffs' "claim that the Corps should be required to supplement the EIS because the [Spillway] is sometimes operated to protect . . . deficient levees" fares no better as a matter of law or logic, for indeed, deficient downstream levees were the very reason for the Spillway in the first place.[8]

For much the same reason, this case bears a striking resemblance with *SUWA*. Presented there with a plaintiff's argument that increased off-road vehicle use was harming wilderness under Bureau of Land Management stewardship, the Supreme Court rejected the plaintiff's argument that the increase at issue constituted "significant new circumstances or information" requiring a supplemental EIS. *See SUWA*, 542 U.S. at 73. The Court distinguished *Marsh* in doing so. Whereas *Marsh* involved a damming project that was incomplete, *SUWA* involved a land use plan that was a done deal. *Id.* As a consequence, "[t]he land use plan [was] the 'proposed action' contemplated by [§ 1502.9(d)(1)]" and there was accordingly "no ongoing 'major Federal action' that could require supplementation." *Id.* The parallels here are clear. Like the finalized land use plan at issue in *SUWA*, and unlike the unfinished dams at issue in *Marsh*, the Spillway is a fixture of

---

[8] This was also the subject of a 1984 operating manual—amended in 1999—that adheres substantially to the original MR&T plan set forth in 1927. The district court correctly found that the plaintiffs failed to identify any forthcoming changes to the Manual and lacked any claim that the adoption or amendment of the Manual triggered supplemental EIS obligations by virtue of the six-year statute of limitations for civil actions against the United States. *See* 28 U.S.C. § 2401(a); *Davis Mountains Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3, 17 (5th Cir. 2004) (holding "that a claim for agency delay in supplementing NEPA documents accrues when circumstances requiring supplementation first arise").

the MR&T that has been operational and materially unchanged for more than 90 years.

In light of the foregoing, NEPA, § 1502.9(d)(1), and Supreme Court precedent make clear that significant new circumstances alone do not necessarily obligate an agency to prepare a supplemental EIS, no matter how great their influence on the environmental concerns NEPA was enacted to address. To the contrary, the Act and regulations require that significant new circumstances have a bearing on federal actions *still being considered*. The Corps' continued operation of the Spillway under long-established plans is no such thing.[9]

In an alternative attempt to avoid dismissal, the plaintiffs argue that the Corps' operation of the Spillway is so different today as to fall beyond "the contemplation of the project when originally approved"—and thus, to constitute new "major Federal action" in and of itself. But this argument, too, is unavailing. To be sure, the record documents at least one occasion in 2019 when the Corps opened the Spillway at a flow rate below the originally contemplated 1.25 million cfs threshold and left the Spillway open when river flow had subsided to a flow rate below the same threshold.[10] However, this one-off episode falls within the discretion the Corps must be afforded to

---

[9] The plaintiffs' equation of the Corps' acknowledgment that opening the Spillway constitutes an "agency action" for the unrelated purposes of the Endangered Species Act with a tacit admission that opening the Spillway is a "major Federal action" under NEPA is dismissed out of hand. In fact, the case the plaintiffs cite in that regard itself disclaims the theory the plaintiffs advance. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) (making the obvious observation that "[i]f there is any difference" between the phrases federal action and *major* federal action, major federal action would be "the more exclusive standard").

[10] As we previously noted, the original plan calls for usage of the Spillway to be "cut off as soon as" flow exceeding 1.25 million cfs subsides.

operate the Spillway in a reasonable manner[11] and, more importantly, does not mark a change in the Corps' considered-and-decided plan for operating the Spillway in the regular course of business. In a similar case, the Ninth Circuit drew an appropriate distinction between an agency's "routine managerial actions regularly carried on from the outset [of a project] without change," and actions "more extensive, [or] other than that contemplated when the project was first operational." *See Upper Snake River Chapter of Trout Unltd. v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990). The latter change in course *would* necessitate a supplemental EIS; the former did not.

Such is the case here as well. Despite the plaintiffs' protestations to the contrary, the episodes the plaintiffs cite—in which the Corps opened the Spillway when river flow was merely *predicted* to exceed 1.25 million cfs, and in which the Corps left the Spillway open to protect workers and downstream levees—do not mark a shift in managerial philosophy or planning, but merely the "routine managerial actions" of an agency tasked with operating a complex and important piece of infrastructure. *Cf. id.* Indeed, for all the parties' factual sparring on the matter, one decisive fact remains: the Spillway and the Corps' criteria for operating it remain unchanged, so this situation does not call for the kind of forward-looking "decisionmaking process" regarding a new "major Federal action" that requires a supplemental EIS. *See Marsh*, 490 U.S. at 374. Continued implementation of a preexisting policy (even under shifting conditions) and adoption or consideration of a *new* policy are birds of a different feather. Only the latter form of agency action requires supplementation of an existing EIS—ruling

---

[11] Reading NEPA and § 1502.9(d)(1) as a trapdoor requiring agencies to prepare a supplemental EIS any time their actions differ in any regard from a plan that has already been the subject of an original EIS would blow a hole in the Supreme Court's "rule of reason" and unreasonably hamper agency action.

otherwise would create a freestanding obligation to supplement that would subject certain agencies to a never-ending game of environmental Whac-A-Mole. In requiring prospective environmental analysis rather than retrospective environmental analysis in NEPA, Congress sanctioned no such game.

What *is* changed in this case is the reality of the conditions in which the Corps must operate the Spillway. In this regard, however, the true culprit for the plaintiffs' environmental misfortunes is not the Corps or the Spillway, but the environment itself. Regardless of cause, the increased operation of the Spillway that aggrieves the plaintiffs and harms the Mississippi Sound is traceable to the fact that the Spillway must now be used *more often*, not that it must now be used in defiance of its original operational plan. New *plans* by an agency require a supplemental EIS; new circumstances do not. *See, e.g.*, *Upper Snake River*, 921 F.2d at 235–36 (Ninth Circuit observing, in a similar case, that while "a particular flow rate will vary over time as changing weather conditions dictate," "[w]hat does not change is the [agency's] monitoring and control of the flow rate" in furtherance of the aims of the project in question). Extending that apt reasoning here, so long as the Corps continues to operate the Spillway in accordance with its longstanding plan—which predated NEPA by a number of *decades*, and which was reaffirmed in 1984 and 1999, *see supra* note 7—it is not obligated to prepare a supplemental EIS with regard to the Spillway.

## III

The upshot of the foregoing analysis is straightforward. Because the Corps has no duty to prepare the supplemental EIS the plaintiffs seek, the plaintiffs have no APA claim for unlawful agency inaction, and the Corps is immune from their suit claiming otherwise. For better or worse, Congress

No. 21-60897

and the Corps have authority to act on the plaintiffs' dire environmental concerns. The federal courts do not.

Accordingly, the district court's dismissal of the plaintiffs' NEPA claims is AFFIRMED.